**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUJAMCYN THEATERS LLC, <br><br>       Plaintiff, <br><br>   v. <br><br> FEDERAL INSURANCE COMPANY and <br> PACIFIC INDEMNITY COMPANY, <br><br>      Defendants. | Civil Action No. <br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Jujamcyn Theaters LLC ("Jujamcyn") complains of defendants Federal Insurance Company ("Federal") and Pacific Indemnity Company ("Pacific") and alleges as follows:

> *I regard the theatre as the greatest of all art forms, the most immediate way in which a human being can share with another the sense of what it is to be a human being.*

> ~ Oscar Wilde

### NATURE OF THIS LAWSUIT

1. For more than 60 years, Jujamcyn has owned and been operating Broadway theaters in New York City, hosting some of the world's most acclaimed shows in some of the world's most historic theaters.  It presently owns and operates five Broadway theaters, making it one of the largest theater owners on Broadway.

2. Prior to March 12, 2020, in any given week when shows were playing in all of its theaters, Jujamcyn could host more than 48,000 people from around the globe.  As of March 12, 2020, *Hadestown* (the winner of eight Tony Awards including Best Musical) was playing at the Walker Kerr Theatre, *The Book of Mormon* (the winner of nine Tony Awards including Best Musical) was playing at the Eugene O'Neill Theatre, and the musicals *Moulin Rouge*, *Frozen*,

1

and *Mean Girls* were playing at Jujamcyn's other three theaters.  Critically acclaimed shows that have previously played in Jujamcyn's theaters include *Springsteen on Broadway*, *Jersey Boys*, and *Kinky Boots*, just to name a few.

3.      By Executive Order of the Governor of the State of New York, "any theater seating five hundred or more attendees for a live performance located in [New York City] shall not hold any further performances after 5pm on March 12, 2020."  As of that date, Jujamcyn was forced to suspend its operations, indefinitely suspend and postpone all of the shows at all of the insured theaters, and had the use and functionality of its premises substantially impaired, due to SARS-CoV-2, COVID-19, the subsequent actions and orders of state and local civil authorities, guidance from the Centers for Disease Control, and the need to mitigate its losses and damage.

4.      All non-essential businesses in New York were later closed by order of the Governor as of March 22, 2020.  Many New York businesses were subsequently authorized to reopen or have some prospect of resuming operations in the near future.  The Broadway theater industry, however, has no such prospects and no reason to believe that theater owners like Jujamcyn will be permitted to open—in any capacity—anytime soon.  As a result, Jujamcyn has suffered, and continues to suffer, substantial financial losses.

5.      Federal and Pacific, members of the Chubb group of insurance companies sold Jujamcyn insurance policies that together provided tens of millions of dollars of insurance and promised a broad blanket of coverage for business income and other losses.  After the outbreak of the pandemic and the issuance of various closure orders, Jujamcyn turned to Federal and Pacific.  However, instead of honoring their promises, Federal flatly denied coverage, refusing to pay even a penny to help Jujamcyn, and Pacific adopted an interpretation severely limiting how much it would pay Jujamcyn.

**THE PARTIES**

6.      Jujamcyn is a foreign limited liability company organized and existing under the laws of the State of Delaware and authorized to conduct business in the State of New York.

7.      Federal and Pacific of members of the Chubb group of insurance companies (also known as Chubb Limited and Subsidiaries).

8.      Jujamcyn is informed and believes, and on that basis alleges, that Federal is incorporated under the laws of Indiana and has its principal place of business in Warren, New Jersey.

9.      Jujamcyn is informed and believes, and on that basis alleges, that Pacific is incorporated under the laws of Wisconsin and has its principal place of business in Whitehouse Station, New Jersey.

10.      The Chubb Group of Insurance Companies makes various representations on behalf of its members companies, including Federal and Pacific, on its website.  It gives the following response there to the question "How is Chubb different?":

> We don't just process claims, we make things right.
>
> We hope you never need to file a claim with us. But if you do, that's our opportunity to show you what "craftsmanship" means in service to you. It means a quick response when you need it most. It means Chubb people working with empathy, integrity and our legendary attention to detail to make you whole. It means we honor the promises we've made to you. Your loved ones, your employees, your home, your business reputation—these things matter. These things are personal, for you and for us.
>
> We're here to help.

https://www.chubb.com/us-en/claims/claims-difference.aspx.

11.      Chubb also represents to the public:

- "If being treated fairly and paid quickly are important to your clients when they have a loss, you want Chubb.  When your

clients insure with Chubb, they're buying **real** insurance."
Chubb Ad, *Business Insurance,* at 11 (Apr. 4, 2008); and

- "The insurance claims process can sometimes be, well, a
  process.  At Chubb, it's different.  That's because we're not just
  in the insurance business, we're in the people business.  Our
  experienced claims specialists are relentless about every
  detail in the most personal way possible.  Whether you have a
  business, homeowners or auto policy, it's our policy to make
  your life easier. . . .  If a solution is possible, we'll find a way
  to make it happen."

https://www.chubb.com/us-en/claims/.

12.     Federal, Pacific and the other members of the Chubb group of insurers claim to

specifically appreciate and understand that "[t]he risks faced by entertainment industry

companies can be unique and vary widely.  Chubb offers customized coverage for property . . .

to support your risk management strategy."  https://www.chubb.com/us-en/business-

insurance/entertainment.aspx.

13.     Even more specifically, Federal, Pacific and the other members of the Chubb

group of insurers claim to understand and appreciate the insurance needs of "Theatrical

Productions":

> Injury to performance, along with property damage and
> cancellation of performances, can spell disaster for theatrical
> productions.  Chubb knows the dangers, so we've created
> insurance programs that offer broad protection.

*Id*.

14.     Federal, Pacific, and the other members of the Chubb group of insurers also

proclaim as follows on their website with respect to SARS-CoV-2 and COVID-19:

> Our hearts go out to those affected by the COVID-19 pandemic.
> We have been — and stand ready to continue — supporting our
> clients, distribution partners and communities.

https://www.chubb.com/microsites/covid19-resource-center/index.aspx.

15.     Chubb also states on behalf of Federal, Pacific, and its other member companies:

> **Doing our part**
> Chubb takes pride in our continuing commitment to our clients.

*Id.*

16.     Chubb echoed these sentiments in a news release in April, stating:

> "We are committed to supporting people, business and
> communities most impacted by this global crisis," said Evan G.
> Greenberg, Chairman and Chief Executive Officer.

https://news.na.chubb.com/2020-04-05-Chubb-Commits-10-Million-to-Pandemic-Relief-Efforts-

Globally-Company-Pledges-No-COVID-19-Layoffs.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 based on complete diversity of the parties and an amount in controversy exceeding

$75,000, exclusive of interest and costs.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## THE COVID-19 PANDEMIC AND
## SUBSEQUENT CIVIL AUTHORITY ORDERS

19.     COVID-19 is a disease caused by the virus known as SARS-CoV-2.  The World

Health Organization has named the virus and a resulting disease:

> Official names have been announced for the virus responsible for
> COVID-19 (previously known as "2019 novel coronavirus") and
> the disease it causes.  The official names are:
>
> **Disease**
> coronavirus disease
> (COVID-19)
> **Virus**
> severe acute respiratory syndrome coronavirus 2
> (SARS-CoV-2).

https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-

the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it

20.     The World Health Organization also provided a straight-forward example of the

distinction between a virus and a disease:

> Viruses, and the diseases they cause, often have different names.
> For example, HIV is the virus that causes AIDS.  People often
> know the name of a disease, such as measles, but not the name of
> the virus that causes it (rubeola).
>
> There are different processes, and purposes, for naming viruses
> and diseases.

*Id.*

21.     The first reported cases of COVID-19 in humans were diagnosed in or around

December 2019 in Wuhan, the capital city of the Hubei Province in China.  Since then, SARS-

CoV-2 and COVID-19 have spread throughout the world, prompting the World Health

Organization to declare a global pandemic.

22.     As explained by the World Health Organization,

> [p]eople can catch COVID-19 from others who have the [SARS-
> CoV-2] virus.  The disease can spread from person to person
> through small droplets from the nose or mouth which are spread
> when a person with COVID-19 coughs or exhales.  These droplets
> land on objects and surfaces around the person.  Other people then
> catch COVID-19 by touching these objects or surfaces, then
> touching their eyes, nose or mouth.  People can also catch COVID-
> 19 if they breathe in droplets from a person with COVID-19 who
> coughs out or exhales droplets.

"How does COVID-19 spread?," World Health Organization (April 16, 2020), *available at*

https://www.who.int/news-room/q-a-detail/q-acoronaviruses.

23.     Aerosolized droplets exhaled by normal breathing can travel significant distances

and stay suspended in air for hours until gravity ultimately forces them to the nearest surface.

Studies suggest that the SARS-CoV-2 virus can remain contagious on some surfaces for up to

six days.  Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental

conditions," *The Lancet Microbe* (April 2, 2020), available at

https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(20)30003-3/fulltext.

24.     Since January 1, 2020, there have been more than 23,279,000 confirmed cases of

COVID-19 throughout the world, more than 805,900 of which have resulted in deaths as of the

date of filing of this complaint.  *See* https://covid19.who.int/.  There have been more than

5,600,000 confirmed cases of COVID-19 in the United States, more than 175,000 of which have

resulted in deaths.  There have been confirmed cases of COVID-19 in every state.  Moreover,

due in part to the initial absence and later limited availability of tests, and questions about the

accuracy of the tests, it is believed that the true number of COVID-19 cases is significantly

higher than the reported numbers might suggest.  *See* https://www.nbcnews.com/health/health-

news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

25.     In response to the pandemic and the worldwide spread of SARS-CoV-2, civil

authorities throughout the United States began issuing "stay-at-home" and "shelter in place"

orders, requiring the suspension of non-essential business operations and ordering businesses to

close in March 2020.

26.     To help create a framework for the implementation of such policies in New York,

Governor Cuomo issued Executive Order No. 202 on March 7, 2020, declaring a state of

emergency in New York (the "March 7 Order").

27.     The potential danger of SARS-CoV-2 being present in theaters is greater than that

posed by many other businesses.  People from all over the country and world travel to New York

to see a Broadway production.  Countless individuals, asymptomatic, pre-symptomatic, or

otherwise, were present at Jujamcyn's theaters prior to March 12, 2020, who may have

unknowingly spread the virus inside the theaters and to countless others before returning to the

cities, states, and countries from which they came.  Additionally, the operation of a Broadway theater involves a large gathering of people within an enclosed space for a prolonged period, increasing the likelihood that SARS-CoV-2 would be in the airspace and on surfaces, and that such theater would be a potential source of exposure.

28.     In apparent recognition of these facts, Executive Order 202.1 was issued on March 12, 2020, directing that "any theater seating five hundred or more attendees for a live performance located in [the City of New York] shall not hold any further performances after 5 pm on March 12, 2020" ("March 12 Order").  This occurred one day after it was widely reported that an individual working at two different Broadway theaters—both of which are well within 10 miles of Jujamcyn's premises—tested positive.  *See, e.g.*, https://www.nytimes.com/2020/03/11/theater/broadway-show-usher-coronavirus.html.

29.     Additionally, Jujamcyn informed Federal that it knew of at least 7 individuals who perform in productions at, or who otherwise work or provide services at, Jujamcyn's theaters, who tested positive for COVID-19, SARS-CoV-2 or the antibodies.

30.     On March 16, 2020, New York City Mayor de Blasio issued Emergency Executive Order No. 100 in which he declared that "the virus physically is causing property loss and damage" ("March 16 Order").  In that same Executive Order, the Mayor of New York City directed that "all entertainment venues, including those with seating capacity below 500, are hereby closed effective Monday, March 16, 2020 at 8:00 PM.  Entertainment venues shall include . . . theatres[.]"  Subsequent Executive Orders continued to describe the physical property damage being sustained by New York businesses.

31.     As of March 22, 2020, all of New York State was subject to the "New York State on PAUSE" executive order which directed all non-essential businesses to close by 8 p.m. on

that date ("March 20 Order").  As of the date of this filing, New York City is in a limited Phase

4 of its reopening plan.  There is no date set or anticipated by which theaters will be permitted to

reopen in any capacity.  There is also no set date set or anticipated by which theaters will be

permitted to reopen at full capacity (or if theaters will ever be permitted to do so absent, for

example, the worldwide availability of a vaccine).

32.     Based on conditions being imposed on businesses across the country, it appears

that if and when Jujamcyn is able to re-open its theaters, it will only be with physical and

structural alterations, potentially including the erection of protective barriers and partitions, new

or re-designed air flow and filtration systems, and even the redesign and physical alteration of

the theaters themselves, including seating, restrooms, pathways for access, and areas for cast,

crew, and musicians.

## FEDERAL AND PACIFIC'S KNOWLEDGE OF THE RISK OF PANEDMICS AND THEIR DECISION TO PROVIDE COVERAGE

33.     Well before Federal and Pacific sold their policies to Jujamcyn, they knew of the

possibility of a pandemic and the potential losses that could be associated with a pandemic. In

fact, they long have known that if there were a pandemic, they could be obligated to pay

substantial amounts under their policies. For years, including for the fiscal year ended December

31, 2019, Chubb stated as follows in its Form 10-K filed with the United States Securities and

Exchange Commission:

> We have substantial exposure to losses resulting from . . .
> catastrophic events, ***including pandemics***.

(emphasis added).  Chubb further routinely stated in this annual filing that "catastrophes"

"including a global or other wide-impact pandemic" may result in "substantial" "losses."  Chubb

further routinely represented in this annual filing that the "forward-looking" "risks" it

contemplated includes "infection rates and severity of pandemics and their effects on our

business operations and claims activity."  Thus, Jujamcyn is informed and believes, and on that basis alleges, that Federal and Pacific knew that that the policies they were selling, including the policies they sold to Jujamcyn, would cover losses associated with pandemics. In fact, as these disclosures show, instead of warning its insureds, including Jujamcyn, that their policies would not cover pandemic-associated losses, Federal, Pacific, and other members of the Chubb group of companies warned the public and their shareholders that the amounts they might have to pay for such losses could affect their financial condition.

34.    There were many other publicly available reports about the risks of pandemics and what insurers should do—in the months and years before Federal sold the Federal Policy to Jujamcyn in 2019 and Pacific sold the Pacific Policy to Jujamcyn in 2019.  *See, e.g.,* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ ("Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community.  In addition, indirect losses would be severe, most notably on the asset side of the balance sheet.").

35.    One insurance industry repository shows the proverbial "tip of the iceberg" about how much information was available to insurers regarding the risks of pandemics.  The Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests."  http://insurancelibrary.org/about-us/.  The Association states on its website:

> The past 20 years has seen the rise of a number of
> pandemics. Slate recently published an article on what has been
> learned about treating them in that time. We thought it might be

apt for us to take a look back and see what the insurance industry
has learned as well.

http://insurancelibrary.org/pandemics-and-insurance/.

36.     Thus, Federal and Pacific knew, and publicly acknowledged, that they could be
obligated to pay for massive losses in the event of a pandemic.  Federal and Pacific also knew
that they could use common and widely available exclusions to guard against being obligated to
pay for pandemic-associated losses.  However, they decided not to do so here, selling Jujamcyn
the all-risks Federal Policy and all-risks Pacific Policy and deliberately omitting from the
policies any potentially applicable exclusion associated with a virus-related pandemic.

## FEDERAL'S "ENTERTAINMENT INSURANCE PROGRAM" POLICY

37.     Federal sold Jujamcyn a "Customarq Series Entertainment Insurance Program"
policy, identified by Policy No. 7944-46-01, for the period May 1, 2019, to May 1, 2020 (the
"Federal Policy").  A true and correct copy of the Federal Policy is attached hereto as Exhibit A
and incorporated herein by reference.

38.     In advance of issuing the Federal Policy to Jujamcyn, Federal engaged in, or had
reasonable opportunities to engage in, extensive underwriting investigation and became familiar
with and knowledgeable regarding the nature and scope of Jujamcyn's business and the nature of
the risks that it was insuring.

39.     The Federal Policy is an "all- risk" property insurance policy—that is, a policy
that insures all risks of physical loss or damage except those plainly, clearly, conspicuously, and
expressly excluded.  The Federal Policy insures, among other things, Jujamcyn's interests in the
real and personal property at the following locations in the City, County and State of New York
(collectively, the "Insured Theaters"):

- St. James Theatre, 246 West 44th Street

- Al Hirschfeld Theatre, 302 West 45th Street

- Walter Kerr Theatre, 219 West 48th Street

- Eugene O'Neill Theatre, 230 West 49th Street

- August Wilson Theatre, 245 West 52nd Street

40. The Federal Policy is comprised of a number of forms and endorsements that define the scope of coverage. Like most commercial property insurance policies, the Federal Policy insures not only against physical loss or damage to covered property, but also for resulting economic and financial losses. This coverage is referred to in the Federal Policy as "Business Income With Extra Expense" coverage. *See* Ex. A, "Business Income With Extra Expense" Endorsement, Form 80-02-1004 (Rev. 7-03).

41. The Federal Policy's Business Income With Extra Expense coverage is designed, understood, stated, and intended to insure Jujamcyn, for economic losses, including losses from "the actual impairment" of its business "operations," suffered as a result of "direct physical loss or damage" to covered property. *Id* The term "impairment" is not defined in the Federal Policy. Neither is the phrase "direct physical loss or damage" to property defined in the Federal Policy.

42. The "Extra Expense" portion of this coverage grant is designed, understood, stated, and intended to cover Jujamcyn for losses from "the actual or potential impairment" of its business "operations." *Id*.

43. Within the Business Income With Extra Expense coverage, the Federal Policy provides an "Additional Coverage" obligating Federal to pay Jujamcyn's "business income loss" and "extra expense" "incur[red] due to the actual impairment of [its] operations, directly caused by the prohibition of access to [its] premises; or a dependent business premises [within 10 miles of its premises], by a civil authority." *Id.* The Federal Policy's coverage for Business Income

losses begins 36 hours after the time of the civil authority's action and applies up to the limit of insurance for each insured premises. Federal Policy, Declarations.

44.     Critically, unlike many policies that provide business income coverage, the Federal Policy does not contain any exclusion for losses caused by or resulting from the spread of viruses, communicable diseases, or pandemics. Because the Federal Policy is an "all-risks" policy that expressly insures all risks not expressly excluded, it insures losses caused by or resulting from viruses, communicable diseases, and pandemics. Simply put, because these perils are not excluded, they expressly are insured "covered perils."

45.     Jujamcyn is informed and believes, and on that basis alleges, that when Federal sold Jujamcyn the Federal Policy, it knew for over a decade that there were standard-form exclusions available in the insurance market-place that could exclude coverage for losses caused by viruses and pandemics; that other insurers included such exclusions in policies they sold; and, in fact, that it and other members of the Chubb Group of Insurance Companies included such exclusions in the policies they sold.

46.     Jujamcyn reasonably expected Federal to pay under its policy for Jujamcyn's financial losses. After all, Federal markets its "Entertainment Insurance Program" specifically to theater owners and operators like Jujamcyn to protect them for losses from closures and other interruptions of their business. Instead of honoring those promises, Federal wrongfully withheld the policy benefits that Jujamcyn is entitled to receive—and that it needs to weather the past, present, and future circumstances associated with the spread of SARS-CoV-2 and actions to "flatten the curve," rebound from its financial losses, and continue operating as a productive member of New York's economy in one of the world's cultural centers.

47.     Worse yet, Federal decided months before it wrongfully denied Jujamcyn's claim that it would deny all business income losses associated with SARS-CoV-2, COVID-19, and closure orders.  The Chubb website contains a "Final – March 26, 2020" notice stating in part:

> Business interruption insurance generally covers losses to your business' income that result from disruption of your business. The disruption must be caused by physical loss or damage to your property by a "covered peril." The presence of an infectious agent or communicable disease at a location where there is covered property generally will not mean that property has suffered "physical loss or damage" under your policy. Generally, "physical loss or damage" means that the physical structure or physical characteristics of the property have been altered by a "covered peril". Loss of use, or diminished value of property that has not been physically altered will not be considered "physical loss or damage."

*See* https://www.chubb.com/microsites/covid19-resource-center/_assets/pdf/covid-commercial-property-policyholder-notice-4-1-2020.pdf.

48.     Federal took this position 10 days after Mayor Bill de Blasio issued Executive Order No. 100 declaring that "the virus physically is causing property loss and damage." Federal also took the same position through its trade association, the American Property Casualty Insurance Association in a letter to the United States House of Representatives Committee on Business. The Association wrote on March 18, 2020, just two days after Mayor de Blasio's order, stating: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."  *See* March 18, 2020, Letter, American Property Casualty Insurance Association, The Council of Insurance Agents & Brokers, Big Independent Insurance Agents & Brokers of America, and National Association of Mutual Insurance Companies to House Committee on Small Business.  Thus, it is clear that before Federal did any meaningful investigation (if it did any investigation at all), it already had decided that it would not pay Jujamcyn for its losses under the Federal Policy.

49.     There is no merit to Federal's refusal to honor its contractual promises to Jujamcyn.  In selling its broad, "all risk" "Entertainment Insurance Program" policy to Jujamcyn, Federal promised to insure financial losses attributable to "direct physical loss or damage" to property as insured under the Federal Policy unless an exclusion clearly and conspicuously applied as a bar to coverage.  Pursuant to governing principles of New York insurance law, as well as authority from other states throughout the country, the presence of SARS-CoV-2 (the virus that causes COVID-19) in a building's airspace and on or around property constitutes "direct physical loss or damage" to property.  Even if it did not, the closure, "stay-at-home," and other orders of civil authorities substantially impaired and rendered incapable the performance of the intended function of Jujamcyn's properties.  Furthermore, even though the insurance industry has employed a standard-form "virus" exclusion since 2006 and has known of the risk of pandemics for years, Federal sold Jujamcyn a policy without any exclusions for financial losses attributable to viruses, communicable diseases, or pandemics.

50.     Furthermore, even if Jujamcyn's theaters did not sustain damage from the presence of SARS-CoV-2, Jujamcyn was obligated under the Federal Policy to take steps, such as closing, to prevent or mitigate loss, and Federal is obligated to pay for losses Jujamcyn incurred, and incurs, in doing so.  Additionally, even if Jujamcyn suffered no "direct physical loss or damage" to its insured property, other provisions in the Federal Policy insure Jujamcyn for its losses resulting from the presence of SARS-CoV-2 elsewhere, losses caused by the issuance of orders of civil authorities (such as the orders issued by Governor Andrew Cuomo and Mayor de Blasio), and interference with ingress or egress to its premises.

## FEDERAL'S BREACHES AND WRONGFUL CONDUCT

51.     As a result of the suspensions of its business operations, Jujamcyn sustained covered Business Income With Extra Expense losses as defined in the Federal Policy.  These

losses were sustained due to the "actual impairment" and/or "potential impairment" of its "operations." These losses were also caused by various orders and declarations issued by the City and State of New York, each of which is a "civil authority."

52. The Orders issued by the City and State of New York were issued due to the presence of SARS-CoV-2 in the City, State, and County of New York and the desire to avoid the spread of SARS-CoV-2 and the disease that it causes, COVID-19. Because the SARS-CoV-2 virus can adhere to surfaces of property for several days and can linger in the air in buildings for several hours, the presence of the SARS-CoV-2 virus on or around property amounts to "direct physical loss or damage" as that phrase is used in the Federal Policy.

53. Given the manner in which SARS-CoV-2 lingers in the air and on surfaces, and its manner of transmission, and the desire to "flatten the curve," Jujamcyn's premises were not capable of being used for their essential functions. Accordingly, the Orders issued by the City and State of New York substantially impaired Jujamcyn's properties, constituting "direct physical loss or damage" to those properties. They also constitute actions "by a civil authority" as a "direct result of direct physical loss or damage" as required to trigger Civil Authority coverage under the Federal Policy.

54. Additionally, the closures were necessary to prevent SARS-CoV-2 from spreading inside of the theaters. The costs and losses associated with the closures therefore constitute reasonable costs incurred to reduce, prevent, or mitigate loss. Federal is obligated to pay these amounts to Jujamcyn pursuant to the Federal Policy which obligated Jujamcyn to "[t]ake every reasonable step to protect the covered property from further loss or damage" (Federal Policy, Ex. A, Conditions) and the common law doctrine of mitigation.

55.     Although Jujamcyn sustained business income losses falling squarely within the Federal Policy's Business Income With Extra Expense and Civil Authority coverages, Federal failed and refused to acknowledge coverage for those losses and refused to pay any portion of them, including the amounts the Jujamcyn has incurred, and is incurring, to mitigate its otherwise insured losses.

56.     Indeed, after a perfunctory "investigation" into Jujamcyn's losses, Federal denied Jujamcyn's claim, incorrectly asserting that its losses were not caused by or the result of direct physical loss or damage or due to the prohibition of access by a civil authority.  Federal took this position even though New York City and New York State had issued orders in response to the presence of SARS-CoV-2 in New York, even though Mayor de Blasio had declared that SARS-CoV-2 was causing property damage, and notwithstanding the fact that the presence of SARS-CoV-2 on or around property amounts to "direct physical loss or damage" to property under the governing rules of insurance policy interpretation and New York law.

57.     Federal also denied any Civil Authority coverage on the incorrect assertion that there was no "prohibition of access" to Jujamcyn's premises because, "although closed," "regular check-ins to ensure all locations are okay have been conducted."  Federal also took this position notwithstanding its simultaneous, entirely inconsistent conclusion, that Jujamcyn closed "due to the mandate by executive orders for location closure."

58.     Jujamcyn is informed and believes, and on that basis alleges, that Federal denied Jujamcyn's claim despite knowing for decades that the contamination of property by a hazardous substance has been deemed to constitute property damage, and, in fact, has litigated and lost this issue.  *See, e.g., AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 842 (1990) ("contamination of the environment satisfies" the requirement of property damage).  *See also*

*Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39-40 (1968) (direct physical loss when gasoline contaminated church building making it dangerous to use); *Farmers Ins. Co. v. Trutanich,* 123 Or. App. 6, 9-11 (1993) (odor from methamphetamine "cooking" constituted "direct physical loss"); *Sentinel Mgt. Co. v. New Hampshire Ins. Co*., 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) ("Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants. . . .  Under these circumstances, we must conclude that contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy.").  At a minimum, in light of these and many other court decisions, Federal knew that its policy language reasonably could be interpreted to cover losses associated with pandemics and viruses.  Jujamcyn is informed and believes and, on that basis alleges, that rather than define "direct physical loss or damage to property," Federal elected to leave the language as is, knowing that insureds could, and likely would understood it to mean that virus- and pandemic-associated losses would be insured.

59.     Federal further compounded the misleading nature of its policy language by omitting a standard-form virus exclusion that could have put insureds like Jujamcyn on possible notice that losses like those associated with the current pandemic might not be insured.

60.     The Federal Policy does not include, and Federal consciously decided not to include, any exclusions conspicuously, plainly, clearly, and unambiguously barring coverage for losses attributable to viruses, communicable diseases, or pandemics.

61.     Numerous property and business interruption insurers, including Federal, issue policies purporting to exclude coverage for losses caused by or resulting from viruses and/or communicable diseases, and such exclusions have been in broad circulation for well over a

decade.  For instance, as noted above, in 2006, the Insurance Services Office ("ISO") introduced

a form exclusion titled "Exclusion for Loss Due to Virus or Bacteria."  ISO is responsible for

drafting many of the insurance policy forms relied on by property insurers throughout the United

States, and many domestic property and business interruption insurers employ ISO forms in their

policies.  In the July 6, 2006, circular prepared as part of its filing of the exclusion with state

insurance regulators, ISO recognized that viruses could cause property damage, stating:

> Disease-causing agents may render a product impure (change its
> quality or substance), or enable the spread of disease by their
> presence on interior building surfaces or the surfaces of personal
> property.  When disease-causing viral or bacterial contamination
> occurs, potential claims involve the cost of replacement of property
> (for example, the milk), cost of decontamination (for example,
> interior building surfaces), and business interruption (time
> element) losses.  Although building and personal property could
> arguably become contaminated (often temporarily) by such viruses
> and bacteria, the nature of the property itself would have a bearing
> on whether there is actual property damage.

62.     ISO and the insurance industry have long recognized that the presence of a virus

on or around property can constitute direct physical loss or damage to property, and many

insurers throughout the country employ exclusions purportedly designed to limit or bar coverage

for certain losses and expenses caused by the presence of a virus.  Federal chose not to do so in

the Federal Policy.

63.     In the face of Federal's denial, Jujamcyn asked Federal to reconsider.  By letter

dated July 6, 2020, Jujamcyn pointed out various factual, legal, and policy reasons why Federal

was wrong.  Jujamcyn also asked Federal several questions.  A true and correct copy of the July

6, 2020, letter is attached hereto as Exhibit B and incorporated herein by reference.  However,

Federal just flatly ignored the letter, never responding, addressing Jujamcyn's points, or

answering Jujamcyn's questions.

64.     To the extent not waived or otherwise excused, Jujamcyn complied with all terms and conditions precedent contained in the Federal Policy.  Therefore, Jujamcyn is entitled to all benefits of insurance provided by the Federal Policy.

### PACIFIC'S "PERFORMANCE DISRUPTION" COVERAGE, "ENTERTAINMENT – PROPERTY INSURANCE FOR THE PERFORMING ARTS" POLICY

65.     Pacific sold Jujamcyn "Performance Disruption" coverage under an "Entertainment – Property Insurance for the Performing Arts Policy," identified by Policy No. (19)7993-60-33, for the period May 1, 2019, to May 1, 2020 (the "Pacific Policy").  A true and correct copy of the Pacific Policy is attached hereto as Exhibit C and incorporated herein by reference.

66.     In advance of issuing the Pacific Policy to Jujamcyn, Pacific engaged in, or had reasonable opportunities to engage in, extensive underwriting investigation, and became familiar with and knowledgeable regarding the nature and scope of Jujamcyn's business and the nature of the risks that Pacific was insuring against.  It agreed to insure, and accepted premiums to insure, the Insured Theaters.

67.     With respect to each theater, the Pacific Policy insures the actual "**business income** loss you incur due to the necessary cancellation, interruption or postponement of one or more of your performances, including the inability to open a new production as scheduled" and "**extra expense** you incur due to the actual or potential cancellation, interruption, postponement or other impairment of one or more of your performances," all provided that it is "caused by or results from a **covered occurrence**."  *See* Ex. B, Form 10-02-1065 (Ed. 8-01).

68.     The Pacific Policy's coverage is subject to a $250,000 "**LIMIT OF LIABILITY (EACH LOSS)**."  *Id*., Declarations.

69.     The Pacific Policy defines "**covered occurrence**" as "any unexpected circumstances beyond your control, except as listed under Exclusions." *Id*., Definitions.  In other words, the loss must be fortuitous and not be excluded.  Pacific does not dispute that Jujamcyn sustained fortuitous performance disruption loss (a "**covered occurrence**") that is not otherwise excluded.

70.     Pacific is also obligated to pay the reasonable costs incurred to reduce, prevent, or mitigate loss pursuant to the Pacific Policy which obligated Jujamcyn to "[t]ake every reasonable step to protect the covered property from further loss or damage" (*id*., Conditions) and the common law doctrine of mitigation.

## PACIFIC'S BREACHES AND WRONGFUL CONDUCT

71.     Pacific bases its significant underpayment and material policy breaches on the Limits of Insurance provision which states as follows:  "The most we will pay in any one occurrence is the amount of loss, not to the exceed the applicable Limit of Insurance shown in the Declarations." *Id*., Limits of Insurance.

72.     Neither "loss" nor  "occurrence" is defined in the Pacific Policy.  However, New York rules of insurance policy interpretation and construction mandate that "**covered occurrence**" and "occurrence" cannot be synonymous and that neither "**covered occurrence**" nor "occurrence" can be synonymous with "loss."  Pacific now uses these undefined terms interchangeably in search of support for its contention that there is but one "occurrence" and one "loss" attributable to all five theaters and thus, Jujamcyn's five insured theaters are only entitled to a total of $250,000 in performance disruption coverage in the aggregate.

73.     Pacific has for years sold insurance protecting Broadway venues and productions from losses should their shows be cancelled, interrupted or postponed by a broad range of

events.  In doing so, Pacific sells policies without any limit on the total amount it might be obligated to pay and without any limit applicable to all losses from a single event, like a pandemic, or as to losses suffered at different venues, or for multiple losses at a single location. In fact, even though language is commonly available in the insurance marketplace to limit coverage in this manner, Pacific elected not to use it in the policy it sold to Jujamcyn.  However, in light of the current pandemic, Pacific is now suffering a serious case of "seller's remorse," contorting language that promises coverage per loss to mean that Jujamcyn gets only one limit for all losses it is suffering at five different theaters from multiple orders, amendments, and extensions of orders.

74.     Jujamcyn turned to Pacific, seeking coverage under its "performance disruption" policy.  Because the policy's only potential limit was for each loss that Jujamcyn might suffer at an insured location, Jujamcyn reasonably expected Pacific to pay for its financial losses at each of the insured locations.  After all, Pacific markets its "Entertainment – Property Insurance for the Performing Arts Policy" specifically to theater owners and operators like Jujamcyn.  Instead of honoring those promises, Pacific stated that its limit for each loss applied to all losses at all five theaters, an interpretation not stated in its policy and contrary to Jujamcyn's reasonable expectations.  Therefore, Pacific deprived Jujamcyn of the financial protection that it needs to weather the past, present and future circumstances associated with the spread of SARS-CoV-2 and actions to "flatten the curve," rebound from its financial losses, and continue operating.

75.     Pacific promised to insure Jujamcyn for losses from unexpected circumstances beyond its control.  The disruptions here were clearly beyond Jujamcyn's control—Jujamcyn did not cause the pandemic and it did not issue the closure orders intended to "flatten the curve."  In

fact, Pacific acknowledged that there were such unexpected circumstances by agreeing to pay $250,000 towards Jujamcyn's losses.  But after that, Pacific got it wrong.

76.     The policy insures Jujamcyn's performance disruption up to $250,000 "**EACH LOSS**" and Jujamcyn sustained "loss" at each of its five insured theaters.  However, as noted, Pacific wrongfully asserted that Jujamcyn's losses at its five different theaters involving five different productions were one "loss."  Based on that false premise, Pacific only tendered the sum of $250,000 and asserted that it would pay nothing more under the policy.  Thus, there is no dispute as to whether Jujamcyn's losses are covered—the only question is whether Pacific can now deprive Jujamcyn of most of the promised coverage by asserting that losses at five different theaters involving five different productions somehow constitute only a single loss and that its policy language is not susceptible to any other reasonable interpretation.

77.     There is no merit to Pacific's refusal to fully honor its contractual promises to Jujamcyn.  In selling its broad, "all risk" "Performance Disruption" coverage under its "Entertainment – Property Insurance for the Performing Arts Policy" to Jujamcyn, Pacific promised to insure financial losses attributable to the "cancellation, interruption or postponement of one or more of [the insureds'] performances" at each of the five insured locations.

78.     By this lawsuit, Jujamcyn seeks damages to compensate it for Pacific's contractual breaches and wrongful conduct.  It also seeks declaratory relief against Pacific confirming that Pacific's purported definition of "loss" (a term which Pacific elected not to define in the policy) is not reasonable or is not the only reasonable interpterion of that undefined word.

79.     It is undisputed that Jujamcyn sustained covered "performance disruption" losses under the Pacific Policy.  Pacific previously tendered the sum of $250,000 to Jujamcyn, which is all that Pacific said it will pay for Jujamcyn's losses at its five theaters.

80.     Each of Jujamcyn's five insured theaters sustained performance disruption "loss."

81.     The St. James Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 7 Order and any subsequent extensions of that order.

82.     The St. James Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 12 Order and any subsequent extensions of that order.

83.     The St. James Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 16 Order and any subsequent extensions of that order.

84.     The St. James Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 20 Order and any subsequent extensions of that order.

85.     The Al Hirschfeld Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 7 Order and any subsequent extensions of that order.

86.     The Al Hirschfeld Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 12 Order and any subsequent extensions of that order.

87.     The Al Hirschfeld Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 16 Order and any subsequent extensions of that order.

88.     The Al Hirschfeld Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 20 Order and any subsequent extensions of that order.

89.     The Walter Kerr Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 7 Order and any subsequent extensions of that order.

90.     The Walter Kerr Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 12 Order and any subsequent extensions of that order.

91.     The Walter Kerr Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 16 Order and any subsequent extensions of that order.

92.     The Walter Kerr Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 20 Order and any subsequent extensions of that order.

93.     The Eugene O'Neill Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 7 Order and any subsequent extensions of that order.

94.     The Eugene O'Neill Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 12 Order and any subsequent extensions of that order.

95.     The Eugene O'Neill Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 16 Order and any subsequent extensions of that order.

96.     The Eugene O'Neill Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 20 Order and any subsequent extensions of that order.

97.     The August Wilson Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 7 Order and any subsequent extensions of that order.

98.     The August Wilson Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 12 Order and any subsequent extensions of that order.

99.     The August Wilson Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 16 Order and any subsequent extensions of that order.

100.    The August Wilson Theatre sustained "business income loss" "due to the necessary cancellation, interruption or postponement of one or more of [its] performances" as a result of the March 20 Order and any subsequent extensions of that order.

101.    The Orders issued by the City and State of New York were issued due to the presence of the SARS-CoV-2 virus in the City, State, and County of New York and the desire to avoid the spread of the virus and the disease that it causes, COVID-19.

102.    Although Jujamcyn sustained and continues to sustain business income losses falling squarely within the Pacific Policy's coverage, Pacific failed and refuses to acknowledge the actual coverage for those losses above $250,000.  In fact, each loss at one theater is separate and distinct from the losses at the other theaters, was suffered with respect to different productions, and is in an amount different from the loss suffered at each other theater.  However, the loss at each theater exceeds $250,000, meaning that the insured losses total more than $1,000,000.

103.    Indeed, after a perfunctory "investigation" into Jujamcyn's losses, Pacific largely denied Jujamcyn's claim, incorrectly asserting that "the COVID-19 pandemic" is the "occurrence" and that Jujamcyn sustained only one "loss" despite Pacific's insuring of five separate theaters.  The Pacific Policy does not include, and Pacific consciously decided not to include, any definitions of these pertinent terms, an aggregate limit of liability, and/or any other language that conspicuously, plainly, clearly, and unambiguously limits coverage as Pacific now contends.

104.    To the extent not waived or otherwise excused, Jujamcyn complied with all terms and conditions precedent contained in the Pacific Policy.  Therefore, Jujamcyn is entitled to all benefits of insurance provided by the Pacific Policy.

**FIRST CAUSE OF ACTION**
**(Breach of Contract against Federal)**

105.    Jujamcyn realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 64 above.

J010.003/285078.1

106.   Jujamcyn performed all obligations required of it under the Federal Policy, except as otherwise excused.

107.   Federal breached its duties under the Federal Policy by unreasonably stating that Jujamcyn sustained no "physical loss or damage;" that Jujamcyn was not prohibited from accessing the insured premises by a civil authority; and by denying coverage for all of Jujamcyn's losses.

108.   As a direct and proximate result of Federal's acts, Jujamcyn has been damaged and will continue to sustain damages anticipated to be up to or beyond the Federal Policy's occurrence coverage limits.

109.   As a result of Federal's breach, Jujamcyn requests entry of judgment for breach of contract, awarding payment of damages in an amount equal to the amount owed under the Federal Policy and consequential damages, each in amounts to be proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Federal)

110.   Jujamcyn realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 64 and 106 through 109 above.

111.   The law imposes on Federal an implied covenant of good faith and fair dealing in the Federal Policy.  Federal breached its implied covenant of good faith and fair dealing in multiple ways, including: (i) undertaking absolutely no investigation whatsoever of Jujamcyn's claim and, instead, arbitrarily and with reckless disregard of Jujamcyn's rights, refusing to acknowledge coverage or even conduct an investigation before denying Jujamcyn's claim for coverage; (ii) denying Jujamcyn's claim with either actual knowledge and/or reckless disregard of the fact that its acts and/or omissions constituted an unreasonable failure to honor its contractual obligations; (iii) knowingly and recklessly basing its denial of coverage on frivolous

grounds which are unsupported by fact, law or the Federal Policy itself and in doing so, showing no regard whatsoever for its insured; and (iv) compelling Jujamcyn to file this suit in order to receive the contractual benefits which it bought and paid for.

112.    Based upon the terms and conditions of the Federal Policy, Federal consciously assumed and/or Jujamcyn was reasonably led to believe that, based on Federal's warranties, such losses would be covered under the Federal Policy.

113.    Jujamcyn has incurred and continues to incur consequential damages including, but not limited to, ongoing extra expenses and attorneys' fees due to Federal's wrongful, unjustified and unreasonable failure to issue payment of amounts due, and improper treatment of the claim, all with the result of wrongfully diverting Jujamcyn from its recovery efforts.

114.    The consequential damages resulting from Federal's bad faith conduct and its breaches of its duty to act in good faith were within the contemplation of the parties at the time the Federal Policy was sold, as the natural and probable result of a breach of the Federal Policy.

115.    The consequential damages resulting from Federal's bad faith conduct and its breaches of its duty to act in good faith were foreseen and/or should have been foreseen when the Federal Policy was sold.

116.    Jujamcyn's damages were foreseeable given the purpose and particular circumstances of the property damage and business interruption coverage sold by Federal under the Federal Policy.

117.    As a result of the foregoing, Jujamcyn requests entry of judgment and an award of damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment against Federal)**

118.    Jujamcyn realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 64 and 106 through 117 above.

119.    Pursuant to the terms of the Federal Policy, Federal is obligated to pay, up to the limit of liability for each insured premises, for property damage, business interruption and time element losses covered under the Federal Policy that are not specifically, clearly and unambiguously excluded.

120.    Jujamcyn's losses are covered under multiple Federal Policy coverage grants and are not excluded.

121.    Federal disputes and denies that it has any contractual obligation to cover any of Jujamcyn's losses under the Federal Policy.

122.    Pursuant to 28 U.S.C. § 2201, Jujamcyn is entitled to a declaration by this Court of Federal's obligations under the Federal Policy.

123.    An actionable and justiciable controversy exists between Jujamcyn and Federal concerning the interpretation and construction of the Federal Policy, and the rights and obligations of the parties thereto, with respect to Jujamcyn's claim.

124.    Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of Jujamcyn and against Federal, declaring that there is coverage available for Jujamcyn's claim up to the full limits of the Federal Policy, and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper. Such a declaration would resolve the current controversy between Jujamcyn and Federal.

## FOURTH CAUSE OF ACTION
### (Breach of Contract Against Pacific)

125.    Jujamcyn realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 36 and 65 through 104 above.

126.    Jujamcyn performed all obligations required of it under the Pacific Policy, except as otherwise excused.

127.    Pacific breached its duties under the Pacific Policy by unreasonably stating that Jujamcyn sustained only one aggregate "loss" despite the Pacific Policy insuring five separate and distinct theaters, and by largely denying coverage for Jujamcyn's performance disruption losses.

128.    As a direct and proximate result of Pacific's acts, Jujamcyn has been damaged and will continue to sustain damages.

129.    As a result of Pacific's breach, Jujamcyn requests entry of judgment for breach of contract, awarding payment of damages in an amount equal to the amount owed under the Pacific Policy and consequential damages, each in amounts to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against Pacific)

130.    Jujamcyn realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 36 and 65 through 104 and 126 through 129 above.

131.    The law imposes on Pacific an implied covenant of good faith and fair dealing in the Pacific Policy.

132.    Pacific breached its implied covenant of good faith and fair dealing in multiple ways, including: (i) undertaking absolutely no investigation whatsoever of Jujamcyn's claim and, instead, arbitrarily and with reckless disregard of Jujamcyn's rights, refusing to fully acknowledge coverage or even conduct an investigation before largely denying Jujamcyn's

claim for coverage; (ii) denying Jujamcyn's claim with either actual knowledge and/or reckless disregard of the fact that its acts and/or omissions constituted an unreasonable failure to honor its contractual obligations; (iii) knowingly and recklessly basing its denial of coverage on frivolous grounds which are unsupported by fact, law or the Pacific Policy itself and in doing so, showing no regard whatsoever for its insured; and (iv) compelling Jujamcyn to file this suit in order to receive the contractual benefits which it bought and paid for.

133.    Based upon the terms and conditions of the Pacific Policy, Pacific consciously assumed and/or Jujamcyn was reasonably led to believe that, based on Pacific's warranties, such losses would be covered under the Pacific Policy.

134.    Jujamcyn has incurred and continues to incur consequential damages including, but not limited to, ongoing extra expenses and attorneys' fees due to Pacific's wrongful, unjustified and unreasonable failure to issue payment of amounts due, and improper treatment of the claim, all with the result of wrongfully diverting Jujamcyn from its recovery efforts.

135.    The consequential damages resulting from Pacific's bad faith conduct and its breaches of its duty to act in good faith were within the contemplation of the parties at the time the Pacific Policy was sold, as the natural and probable result of a breach of the Pacific Policy.

136.    The consequential damages resulting from Pacific's bad faith conduct and its breaches of its duty to act in good faith were foreseen and/or should have been foreseen when the Pacific Policy was sold.

137.    Jujamcyn's damages were foreseeable given the purpose and particular circumstances of the performance disruption coverage sold by Pacific under the Pacific Policy to five separate and distinct theaters.

138.    As a result of the foregoing, Jujamcyn requests entry of judgment and an award of damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### (Declaratory Judgment Against Pacific)

139.    Jujamcyn realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 36 and 65 through 104 and 126 through 138 above.

140.    Pursuant to the terms of the Pacific Policy, Pacific is obligated to pay, up to $250,000 "**EACH LOSS**" for each of the insured theaters.

141.    Each of Jujamcyn's five theaters sustained covered "performance disruption" "loss" that is not excluded and is not subject to a $250,000 aggregate limit.

142.    Pacific disputes and denies that it has any further contractual obligation to cover any of the losses sustained by any of Jujamcyn's insured theaters under the Pacific Policy in excess of $250,000.

143.    Pursuant to 28 U.S.C. § 2201, Jujamcyn is entitled to a declaration by this Court of Pacific's obligations under the Pacific Policy.

144.    An actionable and justiciable controversy exists between Jujamcyn and Pacific concerning the interpretation and construction of the Pacific Policy, and the rights and obligations of the parties thereto, with respect to Jujamcyn's claim.

145.    Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of Jujamcyn and against Pacific, declaring the amount of coverage available for Jujamcyn's claim and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper. Such a declaration would resolve the current controversy between Jujamcyn and Pacific.

### PRAYER FOR RELIEF

WHEREFORE, Jujamcyn  prays for relief as follows:

(a)     On the First Cause of Action, Jujamcyn requests that the Court enter judgment against Federal, awarding Jujamcyn compensatory damages in an amount to be determined at trial, but not less than $75,000;

(b)     On the Second Cause of Action, Jujamcyn requests that the Court enter judgment against Federal, awarding Jujamcyn consequential damages in an amount to be determined at trial;

(c)     On the Third Cause of Action, Jujamcyn requests that the Court enter a declaratory judgment in favor of Jujamcyn against Federal, declaring that Federal is required to pay Jujamcyn up to the limits of the Federal Policy;

(d)     On the Fourth Cause of Action, Jujamcyn requests that the Court enter judgment against Pacific, awarding Jujamcyn compensatory damages in an amount to be determined at trial, but not less than $75,000;

(e)     On the Fifth Cause of Action, Jujamcyn requests that the Court enter judgment against Pacific, awarding Jujamcyn consequential damages in an amount to be determined at trial;

(f)     On the Sixth Cause of Action, Jujamcyn requests that the Court enter a declaratory judgment in favor of Jujamcyn against Pacific, declaring that the Pacific Policy is not subject to an aggregate limit of $250,000 and that Pacific is required to pay Jujamcyn for each of the losses sustained at each of the insured theaters; and

(g)     On all Causes of Action, Jujamcyn requests that the Court award costs, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law, and such other, further, and different relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Jujamcyn hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
       August 24, 2020

**PASICH LLP**

By:   /s/ Jeffrey L. Schulman
      Jeffrey L. Schulman (JS-5739)
      757 Third Avenue, 20th Floor
      New York, New York 10017
      Telephone: (212) 686-5000
      JSchulman@PasichLLP.com

                  -and-

      Kirk Pasich (*pro hac vice* to be filed)
      10880 Wilshire Boulevard, Suite 2000
      Los Angeles, California 90024
      Telephone:  (424) 313-7850
      KPasich@PasichLLP.com

      *Attorneys for Jujamcyn Theaters LLC*